UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
LUIS OLIVERAS,                         :

                Plaintiff,             :      REPORT & RECOMMENDATION

        -against-                      :      06 Civ. 3578 (DAB)(MHD)

THOMAS WILKINS, FEDERAL SECURITY       :
DIRECTOR, TSA, LAGUARDIA AIRPORT,
                                       :
                Defendant.[1]          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:


        Plaintiff Luis Oliveras, an Hispanic male, is a former

employee of the Transportation Safety Administration ("TSA"), an

arm of the United States Department of Homeland Security ("DHS").

He commenced this pro se lawsuit against an official of the TSA on

March 23, 2006, in the wake of his termination as a Transportation

Security Screener ("TSS") at LaGuardia International Airport.

Invoking Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e-

16, plaintiff alleges that the TSA engaged in gender discrimination

in terminating him following his altercation with a female TSS,

Naomi Travis.

------------

        [1] Because TSA is a component of the Department of Homeland
Security, Homeland Security Secretary Janet Napolitano is the
proper defendant in this action. See 42 U.S.C. § 2000e-16(c).

On March 30, 2011 defendant moved for summary judgment. Defendant argues that plaintiff cannot establish a prima facie claim of gender discrimination. In the alterative, defendant asserts that even if plaintiff made a successful prima facie showing, he could not demonstrate that defendant's stated non-discriminatory basis for terminating him, and not his female coworker, was a pretext for discrimination. Plaintiff opposes, asserting that the TSA engaged in gender discrimination by terminating him and not Ms. Travis. He argues that he makes a successful prima facie showing, and asks that we deny defendant's summary-judgment motion.

BACKGROUND

I. Factual Background and Prior Proceedings

The following facts are undisputed unless otherwise noted.[2]

---

[2] Plaintiff failed to file a required counter-statement to Defendant's Rule 56.1 Statement of material facts ("Def.'s R. 56.1"). See Local Civ. R. 56.1(b) ("The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the [Rule 56.1] statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."). Generally, a plaintiff's "'failure to respond or contest the facts set forth by the

Plaintiff began working as a TSS for the TSA at LaGuardia on November 10, 2002. (Def.'s R. 56.1 ¶ 1; Decl. of Shane Cargo ("Cargo Decl."), Ex. A, ¶ 2 & Ex. B, at US 0061, Mar. 30, 2011). On June 3, 2004, a passenger reported having forgotten his money clip in one of the x-ray bins in the security lane at which plaintiff was working. (Def.'s R. 56.1 ¶ 5; Decl. of Thomas H. Wilkins ("Wilkins Decl."), Ex. 4, at US 0075-76, Mar. 30, 2011). Plaintiff

---

defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed.'" Jessamy v. City of New Rochelle, N.Y., 292 F. Supp.2d 498, 504 (S.D.N.Y. 2003) (quoting NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F. Supp.2d 134, 139 (S.D.N.Y. 2003)); Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).

In light of plaintiff's pro se status, we will accept as true only those assertions in defendant's Rule 56.1 Statement that "'are supported by admissible evidence, and otherwise uncontroverted by admissible evidence.'" Judge v. N.Y.C. Police Dep't, 2012 WL 98509, at *1 n.2 (S.D.N.Y. Jan. 12, 2012) (quoting Augustin v. Yale Club of N.Y.C., 2006 WL 2690289, at *1 (S.D.N.Y. Sept. 15, 2006)); see also Young v. Nassau Univ. Med. Ctr., 2011 WL 6748500, at *1 n.2 (E.D.N.Y. Dec. 22, 2011) (overlooking pro se plaintiff's failure to file a response to defendant's Rule 56.1 statement and deeming "admitted only those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record").

claims that he retrieved the item and inquired whether it belonged to anyone in the area. (Def.'s R. 56.1 ¶ 6; Wilkins Decl. Ex. 4, at US 0075). Presumably there was no response, and plaintiff forgot that it was in his possession. (Def.'s R. 56.1 ¶ 6; Wilkins Decl. Ex. 4, at US 0075-76). Later, the clip was discovered on plaintiff's person, and his supervisor had the impression that Oliveras had attempted to steal it. (Def.'s R. 56.1 ¶ 7; Wilkins Decl. Ex. 4, at US 0076-78). Plaintiff was suspended for three days, and reassigned to a different terminal upon his return to work. (Def.'s R. 56.1 ¶ 8; Wilkins Decl. Ex. 4, at US 0078).

Two weeks later, on June 17, 2004, plaintiff was involved in an altercation with a female TSS, Ms. Naomi Travis (the "June 17 incident"). (Def.'s R. 56.1 ¶¶ 16-17; Cargo Decl. Ex. A, ¶ 8).[3] On that date, plaintiff and Ms. Travis were both working as screeners on Lane Three of the Delta Airlines terminal. (Def.'s R. 56.1 ¶¶ 9-10; Wilkins Decl. Exs. 1-2). Plaintiff called a "bin check" of a suspicious object after the passenger had already regained possession of the suspect item. (Def.'s R. 56.1 ¶¶ 10-11; Cargo Decl. Ex. B, at US 0063-64; Wilkins Decl. Ex. 4, at US 0078-79).

_____

[3] Plaintiff objects to characterizing the June 17 incident as a "fight" or "altercation;" he insists that he was "assaulted" by Ms. Travis. (E.g., Resp. to Shane Cargo's Decl. 1, June 7, 2012).

4

Ms. Travis questioned the passenger and cleared the item for carry-on. (Def.'s R. 56.1 ¶ 12; Cargo Decl. Ex. C, at US 0116).

Ms. Travis told plaintiff that he had called the bin check too late because the passenger had already retrieved the suspicious item when the check was called. (Def.'s R. 56.1 ¶ 13; Cargo Decl. Ex. B, at US 0064 & Ex. C, at US 0116). Plaintiff responded by telling Ms. Travis not to snap at him, and then allegedly told another TSS, Mr. Andres Senquiz, that she was "giving [him] attitude." (Def.'s R. 56.1 ¶ 14; Wilkins Decl. Ex. 4, at US 0079-81; Cargo Decl. Ex. B, at US 0064). Ms. Travis then approached plaintiff, asked him why he was talking about her, and called him a thief. (Def.'s R. 56.1 ¶¶ 15-16; Wilkins Decl. Ex. 4, at US 0079-81; Cargo Decl. Ex. B, at US 0064). It is somewhat unclear exactly what happened next. However, it is undisputed that plaintiff and Ms. Travis became involved in a verbal confrontation that escalated into a physical altercation. (Def.'s R. 56.1 ¶ 17; Cargo Decl. Ex. B, at US 0064; Wilkins Decl. Ex. 4, at US 0080). Plaintiff maintains that Ms. Travis initiated the conflict without provocation, scratching him across his face and neck (e.g., Cargo Decl. Ex. B, at US 0064; Wilkins Decl. Ex. 4, at US 0080-81), and that he never put his hands on her. (Cargo Decl. Ex. C, at US 0119). Ms. Travis reported that plaintiff had initiated the

5

physical confrontation by pushing her "in her face," after which she defended herself by punching or "swing[ing] back" at him. (Cargo Decl. Ex. C, at US 0116).[4]

   The TSA conducted an investigation of the underlying incident. In connection with its investigation, the TSA obtained written incident statements from ten TSA employees -- five TSA screeners who were present during the incident, three supervisors who were not, and plaintiff and Ms. Travis. (Def.'s R. 56.1 ¶ 18; Cargo Decl. Ex. C, at US 0108-0123). None of the witnesses reported having seen who had initiated the physical aspect of the fight. (E.g., Cargo Decl. Ex. C, at US 0108, 0112, 0114, 0120-22). Despite the witnesses' incident reports, plaintiff alleges that Mr. Senquiz, another TSS who was present at the scene, saw Ms. Travis strike plaintiff, initiating the confrontation. (Cargo. Decl. Ex. H, Oliveras Dep. 72:21-75:20). However, Senquiz's incident report indicates that he "was unable to see who attacked first." (Id. Ex.

_____

[4] Ms. Travis also reported that plaintiff "jumped off the bray [sic] in[to] [her] face [and] started yelling and calling [her] names; he [then] pointed his finger in [her] face [and she] moved his hand." (Cargo Decl. Ex. C, at US 0116). After some back-and-forth name calling, Ms. Travis reports that plaintiff "pushed" her in the face. (Id.).

6

C, at 0120).[5]

Following the incident, both plaintiff and Ms. Travis were placed on administrative leave for two months. (Def.'s R. 56.1 ¶ 21; Wilkins Decl. Ex 1, at US 0131-32 & Ex. 2, at US 0181-82; Cargo Decl. Ex. D, at US 0016 & Ex. E, at 0085). On July 2, 2004, Mr. Neal Lauro, then Assistant Federal Security Director at LaGuardia, provided plaintiff and Ms. Travis with written "Notices of Proposed Removal," which recommended that they both be terminated from TSA employment for their "improper conduct." (Def.'s R. 56.1 ¶ 22; Wilkins Decl. Exs. 1-2; Cargo Decl. Ex. F, at 0089). Both plaintiff and Ms. Travis were given the opportunity to submit written affidavits and other evidence in opposition to the proposals. (Def.'s R. 56.1 ¶¶ 23-24; Wilkins Decl. Exs. 1-2; Cargo Decl. Ex. F, at 0089).[6]

---

[5] Plaintiff maintains, albeit without proof, that Mr. Senquiz forged his incident report in concert with Mr. Robert Creager, a TSA supervisor. (Def.'s R. 56.1 ¶ 55; Cargo Decl Ex. H, Oliveras Dep. 107:19-117:23).

[6] Both parties were also on notice that a final decision would not be made "until [their] written and/or oral replies [were] received and considered, or, if no reply [was] received, until after the time specified for replies" had passed. (Def.'s R. 56.1 ¶ 24; Wilkins Decl. Exs. 1-2; Cargo Decl. Ex. F, at 0089). If no reply was received, the proposal explained that the decision would "be made based on the information of record." (Id.).

7

On June 27, 2004, plaintiff submitted a written appeal to the improperly named defendant Thomas Wilkins, who was the deciding official in his case. (Def.'s R. 56.1 ¶ 27; Wilkins Decl. ¶ 4 & Ex. 4). In that document, plaintiff recounted his version of the events of June 3 -- when plaintiff was found in possession of a passenger's money clip -- and the June 17 incident. Plaintiff also met with Wilkins on August 9, 2004. (Def.'s R. 56.1 ¶ 27). Ms. Travis met with Robert DeFrancesco, the Deputy Federal Security Director (and perhaps also Mr. Lauro, Assistant Federal Security Director); DeFrancesco instructed her to submit a written statement "defending her job." (Cargo Decl. Ex. I, Travis Dep. 12:3-8, 14:3-12, 18:3-11).

Following the appeals period, Mr. Wilkins concluded that it was appropriate to terminate plaintiff because he had been the aggressor in the June 17 incident. (Def.'s R. 56.1 ¶ 30; Wilkins Decl. ¶¶ 4-5 & Ex. 4). Plaintiff denies that he was the aggressor. (E.g., Cargo Decl. Ex. H, Oliveras Dep. 84:16-19 ("I remember I was assaulted on the job by a fellow employee.")). He also disputes the basis of the TSA's termination decision, stating that it was "not a business decision." (See Mot. of Decl. ("Pl.'s Mot. Decl.") 6, Apr. 14, 2011; Supplemental Papers in Opp'n to Def.'s Summ.-J. Mot. ("Pl.'s Supplement") 5).

Mr. Wilkins sent plaintiff his "Decision on Proposed Removal" on August 13, 2004. (Def.'s R. 56.1 ¶ 30; Wilkins Decl. ¶ 5 & Ex. 6). That decision stated that in plaintiff's appeal, "[he had] failed to supply any new information to mitigate the proposed termination. When [he] caused a disturbance at the Checkpoint it adversely affected [the TSA's] ability to provide proper security. After considering all the information of record, [Mr. Wilkins] decided [that plaintiff's] removal from employment [was] appropriate." (Def.'s R. 56.1 ¶ 30; Wilkins Decl. Ex. 6, at US 0133). Plaintiff's termination was effective as of the date of that decision. (Wilkins Decl. Ex. 6, at US 0133).[7]

Deputy Federal Security Director DeFrancesco heard Ms. Travis's appeal and was the ultimate decisionmaker in her case. (Def.'s R. 56.1 ¶¶ 25-26; Wilkins Decl. ¶ 6).[8] Based on witness statements and Ms. Travis's appeal, Mr. DeFrancesco determined that she was not the aggressor in the June 17 incident, and that she had acted in reasonable self-defense. (Def.'s R. 56.1 ¶ 26; Wilkins

---

[7] Plaintiff was notified of his right to appeal Mr. Wilkins's decision to the TSA Disciplinary Review Board within thirty days. (Wilkins Decl. Ex. 6, at US 0133). The record does not reflect whether he exercised his right to appeal.

[8] Mr. Wilkins was not involved the final decision regarding Ms. Travis because he was on leave when her appeal was heard. (Def.'s R. 56.1 ¶ 25; Wilkins Decl. ¶ 6).

Decl. Ex. 7, at US 0180 ("during the appeal [Ms. Travis] state[d] that [she was] provoked and acted in self-defense. As a result of that appeal [Mr. DeFrancesco] along with Mr. Thomas Wilkins agree[d] that the Notice of Proposed Removal be rescinded and that [she] be placed back to duty effective August 4, 2004")).

On September 10, 2004, plaintiff filed a request for informal Equal Employment Opportunity ("EEO") Counseling with TSA's Office of Civil Rights and Civil Liberties. (Def.'s R. 56.1 ¶ 31; Aff. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Aff.") 13, Apr. 22, 2011). Plaintiff complained that he had been treated differently from other TSA employees because "[he] had reported that [Ms. Travis] had physically assaulted [him] and vice versa," and because Ms. Travis "[had] since returned back to work even though [they] both reported the same charge against each other." (Def.'s R. 56.1 ¶ 32; Cargo Decl. Ex. D, at US 0028).[9] Plaintiff asked to be reinstated to his prior position. (Def.'s R. 56.1 ¶ 33; Cargo Decl.

---

[9] Plaintiff did not write anything in the space on the EEO form where he was directed to specify what "factors of discrimination" he was alleging; he also failed to identify a basis for discrimination during his EEO counseling. (Def.'s R. 56.1 ¶ 33; Cargo Decl. Ex. D, at US 0014-15, 0027). According to an EEO Office of Civil Rights Contact Sheet, plaintiff had indicated over the phone on August 30, 2004 that his only basis for seeking EEO relief was his "race (Puerto Rican)." (Cargo Decl. Ex. D, at US 0050).

Ex. D, at US 0028).

On or after December 30, 2004, EEO counselor Arlene Ashton issued an EEO counselor's report related to plaintiff's discrimination complaint. (Def.'s R. 56.1 ¶ 39; Cargo Decl. Ex. D, at US 0013-51).[10] That report reflected a November 5, 2004 conversation with Wilkins, who had stated that both plaintiff and Ms. Travis were placed on administrative leave following the June 17 incident pending resolution of the investigation into the altercation, and that he had determined that it was appropriate to terminate plaintiff because he had "made the first aggressive move." (Def.'s R. 56.1 ¶¶ 40-41; Cargo Decl. Ex. D, at US 0017). He also indicated that plaintiff's "reinstatement was not an option." (Cargo Decl. Ex. D, at US 0017).

On June 14, 2005, plaintiff submitted an affidavit to one of the TSA's EEO investigators, Ms. Karen Y. Gibson. (Def.'s R. 56.1 ¶ 34; Cargo Decl. Ex. B, at US 0061-66).[11] In that affidavit,

---

[10] The report indicates that the date that the counseling report was "requested" was December 21, 2004. However it does not indicate the date when the report was "submitted." (Cargo Decl. Ex. D, at US 0014). The report also notes that as of December 30, 2004, the parties had not engaged in mediation. (Id. at US 0015).

[11] Plaintiff swore that the statement was "true and complete to the best of [his] knowledge and belief." (Def.'s R. 56.1 ¶ 36; Cargo Decl. Ex. B, at 2).

plaintiff recounted the events of June 17, 2004 and explained that he did "not understand why Mr. Wilkins only removed [him] from [his] position and allowed Ms. Travis to remain." (Def.'s R. 56.1 ¶ 37; Cargo Decl. Ex. B, at US 0064). He stated that "he [felt he] was discriminated against based on [his] sex" because "Mr. Wilkins did not terminate Ms. Travis who is a female." (Def.'s R. 56.1 ¶ 38; Cargo Decl. Ex. B, at US 0064).

Somewhat confusing the situation, plaintiff may also have filed a charge with the Equal Employment Opportunity Commission ("EEOC") while his agency complaint was still pending before the TSA. (See Cargo Decl. Ex. A, Designation of Agency Representative). In any event plaintiff subsequently requested that the EEOC dismiss the complaint, which it did by an order misdated October 11, 2001 and actually issued on October 11, 2005. (Def.'s R. 56.1 ¶ 42; Cargo Decl. Ex A, at Dismissal Order). The EEOC order further directed that the DHS issue a final agency decision on plaintiff's complaint within sixty days, that is, by December 10, 2005. (See Cargo Decl. Ex. A, at Dismissal Order & Am. Compl. 1-2).

The DHS failed to issue a final decision by that date, and plaintiff filed a pro se form complaint on March 23, 2006. (Def.'s R. 56.1 ¶ 43). By order dated May 11, 2006 then-Chief Judge Mukasey

12

dismissed the complaint under 28 U.S.C. § 1915(e) without prejudice
to plaintiff filing an amended pleading within sixty days to set
forth in greater detail the facts suggesting discrimination and, if
possible, confirming whether the DHS had finally issued a decision
on his complaint and, if not, whether he had nonetheless exhausted
his administrative remedies. (Def.'s R. 56.1 ¶¶ 43-44; Order 4-6,
May 11, 2006).

Plaintiff filed an amended complaint on May 23, 2006, alleging
retaliation and discrimination based on his race and gender.
(Def.'s R. 56.1 ¶¶ 46-47; Cargo Decl. Ex. A). In response to that
pleading, defendant moved to dismiss on October 20, 2006. (Def.'s
R. 56.1 ¶ 48-51; Report & Recommendation, October 1, 2009).
Defendant's motion to dismiss the amended complaint was granted in
part and denied in part; the race-discrimination and retaliation
claims were dismissed, leaving plaintiff's Title VII gender-
discrimination claim as the only remaining claim. (Id.).

Plaintiff was deposed on November 4 and December 14, 2010.
(Def.'s R. 56.1 ¶ 52; Cargo Decl. Ex. H). Plaintiff deposed Ms.
Travis, Mr. Senquiz, and Mr. Lauro on February 25, 2011. (Def.'s R.
56.1 ¶ 61; Cargo Decl. Exs. I-K).

13

Defendants filed a summary-judgment motion on March 30, 2011. In partial response, plaintiff filed a Rule 56(d) request on April 14, 2011 to depose Mr. Wilkins, who had decided to terminate plaintiff, and Mr. DeFrancesco, who had decided to retain Ms. Travis.[12] The court granted Oliveras' request by Order dated March

_____

[12] The original discovery deadline in this case was set for September 30, 2010. (See Order 2, Apr. 29, 2010). We extended discovery until November 16, 2010 to accommodate the rescheduling of plaintiff's deposition, which he had failed to attend. (See Order 3, Oct. 15, 2010). The Court first became aware that defendant was seeking to depose Mr. Wilkins and Mr. DeFrancesco through plaintiff's "Motion to Depose TSA Director, Acting Director + Staff," filed on October 29, 2010. Per our Order dated November 5, 2010, we construed this motion to be a notice of deposition, and explained that the request required no further court action at that time. (See Order, Nov. 5, 2010). Plaintiff reiterated his desire to depose Mr. Wilkins and Mr. DeFrancesco in a number of subsequent letters to the court. (See, e.g., Letter from Plaintiff, Dec. 20, 2010). On December 21, 2010, we issued an Order extending the discovery deadline until January 31, 2011 in view of plaintiff's expressed intention to depose additional witnesses. On February 8, 2011, we issued an Order on plaintiff's Motion to Compel, dated January 24, 2011, which further extended the deposition deadline to February 28, 2011 in light of defendant's withholding of certain discovery documents from plaintiff prior to his scheduled depositions of TSA employees.

In a "Motion to Compel Depositions" filed on March 2, 2011, plaintiff explained that neither Mr. DeFrancesco nor Mr. Wilkins had attended the February 25, 2011 depositions for which they had been noticed. Plaintiff then asked for leave to depose them both. (Pl.'s Mot. to Compel Deps. ("Pl.'s Mot. Compel") 3-4, Mar. 2, 2011). In that motion, he acknowledged that a TSA representative had informed him that Mr. Wilkins had retired from the TSA. (Id. at 2). Plaintiff noted that although Mr. Wilkins had retired, plaintiff had mailed a deposition notice to his home. (Id. at 4). In a similar letter dated March 23, 2011, plaintiff again asked us to order the depositions of Mr. DeFrancesco and Mr. Wilkins. By Order dated April 5, 2011, we denied plaintiff's March 23,

14

5, 2012. We directed defendant to produce DeFrancesco for a deposition, based on the understanding that he was still a TSA employee, and to inform plaintiff whether Wilkins would appear voluntarily. In response, defendant submitted a March 28, 2012 letter to the court, specifying that neither Wilkins nor DeFrancesco was still employed by the TSA. Defendant further specified that Wilkins had consented to a telephone deposition, but that Mr. DeFrancesco would not appear for a deposition absent a subpoena. (See Letter to the court from Assistant United States Attorney Shane Cargo ("Cargo Letter"), Mar. 28, 2012).

Thus, to "ensure clarity as to the procedures to implement" our March 5 Order granting plaintiff's 56(d) request, we issued a subsequent order specifying, among other things, that if plaintiff

---

2011 request for any further discovery, including those depositions that he sought, as untimely. In letters dated April 3 and April 6, 2011, plaintiff reminded the court that he had not been able to depose Mr. Wilkins or Mr. DeFrancesco. He explained that he needed to depose them because they have information that is integral to proving his case. (E.g., Letter 1-2, 5-6, Apr. 3, 2011). In our April 8, 2011 Order, we referred plaintiff to our April 5, 2011 Order and again denied his request for further discovery. We also directed him to make a Rule 56(d) application to demonstrate why such depositions were necessary, which we would consider at the appropriate time. (See Order, Apr. 8, 2011). Pursuant to our Order, plaintiff filed a Motion of Declaration under 56(d) on April 14, 2011. Plaintiff maintains that Mr. DeFrancesco and Mr. Wilkins are "key" TSA employees who "acted in concert to violate" his Title VII civil rights. (Pl.'s Mot. Decl. 1-2).

wished to depose Mr. DeFrancesco, he was to arrange to subpoena him by no later than April 12, 2012. (Order ¶ 4, Mar. 29, 2012). Plaintiff then requested clarification of our March 29 Order by letter sent March 30, 2012. We issued an order again explaining that Mr. Wilkins would appear for deposition voluntarily, without subpoena, whereas Mr. DeFrancesco would not appear without subpoena. (Order, Apr. 9, 2012). Even after these multiple instructions from the court, plaintiff failed to subpoena DeFrancesco, who therefore did not appear for a deposition. Plaintiff deposed Mr. Wilkins via telephone on April 30, 2012.

## II. Defendant's Summary-Judgment Motion

Defendant moved for summary judgment on March 30, 2011. She argues that plaintiff cannot establish a prima facie case of gender discrimination because there is "no evidence" suggesting that plaintiff was terminated because of his gender, and because plaintiff fails to allege "a single fact that would support an inference that gender played any role in TSA's decision." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 15-18). In addition, defendant argues that plaintiff and Ms. Travis are not "similarly situated in all material respects," and that therefore their differing fates cannot support an inference of

16

discrimination. In the alternative, defendant asserts that even if plaintiff established a prima facie case of discrimination, the TSA had a legitimate, non-discriminatory reason for terminating plaintiff -- his role as aggressor in the June 17 altercation with Ms. Travis. Further, defendant argues that plaintiff is unable to demonstrate, and offers no admissible evidence that suggests, that the TSA's proffered reason for plaintiff's termination is a pretext for discrimination. (Def.'s Mem. 18-24). Plaintiff opposes.[13]

## ANALYSIS

### I. Summary-Judgment Standards

Under Federal Rule 56, summary judgment will be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. N.Y., 366 F.3d 138, 148

---

[13] Plaintiff wrote two letters to the Court dated April 3, 2011 and April 6, 2011, which we construed as his responses to summary judgment. (See Order, April 8, 2011). In addition, on April 22, 2011, plaintiff filed an Affirmation in Opposition to Defendant's Motion for Summary Judgment. Plaintiff submitted supplemental opposition papers on May 25, 2012, following his deposition of Wilkins. Defendant responded on June 1, 2012, and plaintiff replied on June 7, 2012.

17

(2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of informing the court of the basis for her motion and identifying those portions of the "materials in the record, including depositions, documents, electronically stored information, affidavits, stipulations . . . or other materials," if any, that demonstrate the absence of a genuine issue of material fact. See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322. If the non-moving party has the burden of proof as to a particular issue, the movant may satisfy her initial burden by demonstrating the absence of evidence supporting an essential element of the non-moving party's claim. See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996). In making this judgment, the court must view all evidence in the light most favorable to the non-moving party, Overton v. N.Y. State Div. of Military & Naval Affairs, 373

18

F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004).

If the moving party carries her initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. <u>See</u>, <u>e.g.</u>, <u>Beard v. Banks</u>, 548 U.S. 521, 529 (2006); <u>Celotex</u>, 477 U.S. at 323-24; <u>Santos v. Murdock</u>, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest merely on allegations or denials of the factual assertions of the movant, Fed. R. Civ. P. 56(e); <u>see</u>, <u>e.g.</u>, <u>Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti</u>, 374 F.3d 56, 59-60 (2d Cir. 2004), nor can he rely on his pleadings or on merely conclusory factual allegations or speculation. <u>See</u>, <u>e.g.</u>, <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000); <u>Price v. Mount Sinai Hosp.</u>, 2010 WL 4910218, at *3 (Nov. 23, 2010) (citing <u>Golden Pac. Bancorp v. F.D.I.C.</u>, 375 F.3d 196, 200 (2d Cir. 2004)). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see also</u> <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 75 (2d Cir. 2005).

19

Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994). In other words, he must demonstrate that there is sufficient evidence for a reasonable jury to find in his favor. Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 455-56 (2d Cir. 2007) (citing Anderson, 477 U.S. at 249). However, if the movant fails to meet her initial burden, the motion will fail even if the opponent does not submit any evidentiary matter to establish a genuine factual issue for trial. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 677-78 (2d Cir. 1997).

It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir.

2000).

Finally, we note that, as a general matter, we must take care to construe a pro se litigant's papers liberally, in deference to his pro se status. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (affording "special solicitude" to pro se litigants "confronted with motions for summary judgment"); Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (internal quotation marks omitted) (quoting Reyes v. Koehler, 815 F. Supp. 109, 112 (S.D.N.Y. 1993)) (noting that pro se litigants are to be given "special latitude on summary judgment motions"). Accordingly, we interpret a pro se litigant's papers to "raise the strongest arguments that they suggest." Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). This does not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).

II. Title VII Gender Discrimination - Burden of Proof

Under Title VII, an employer may not "discriminate against any individual . . . because of such individual's race, color,

21

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a claim for disparate treatment under Title VII, the plaintiff must demonstrate both that he was subjected to an adverse employment action and that his race, color, religion, sex, or national origin was a motivating factor in the action. 42 U.S.C. § 2000e-2(a). We apply the three-step burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze plaintiff's discrimination claim. Bernard v. JP Morgan Chase Bank NA, 408 F. App'x 465, 467 (2d Cir. 2011).

The first step in this analysis involves an examination of the plaintiff's proof of a prima facie case of discrimination, Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001), which is a de minimis burden. See Weinstock, 224 F.3d at 42. A plaintiff need only demonstrate (1) that he belongs to a protected class; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected class. See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (citing, inter alia, McDonnell Douglas Corp., 411 U.S. at 802). "[A] showing of disparate treatment, while a common and especially

22

effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case, is only one way to discharge that burden." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001). The Second Circuit has recognized a variety of ways in which a plaintiff can raise an inference of discrimination. Such an inference may be drawn from

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

Bernard v. J.P. Morgan Chase Bank N.A., 2010 WL 423102, at *8 (S.D.N.Y. Feb. 5, 2010) (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37-38 (2d Cir. 1994))).

If a plaintiff carries his prima facie burden, the defendant is required to articulate a neutral, or non-discriminatory, reason for her actions. See, e.g., Weinstock, 224 F.3d at 42. "The employer need not persuade the Court that the proffered reason was

23

the actual reason for the adverse action; rather the employer's burden is simply to rebut the plaintiff's prima facie case by clearly setting forth, 'through the introduction of admissible evidence, the reasons for the [adverse action against the plaintiff].'" Wali v. One Source Co., 678 F. Supp.2d 170, 180 (S.D.N.Y. 2009) (alteration in original) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)).

If defendant articulates a non-discriminatory reason for the adverse action, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that defendant's explanation was but a pretext, and that discriminatory animus was in fact a motivating factor in the adverse employment action. See Weinstock, 224 F.3d at 42. "A reason given by an employer for its action cannot be proven to be pretextual unless the plaintiff shows that the reason was false and that discrimination was 'the real reason.'" Wali, 678 F. Supp.2d at 180 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Hence, "[a]t the summary judgment phase, the plaintiff 'must establish a genuine issue of material fact . . . as to whether the employer's reason for the adverse action is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision.'" Id. (quoting Gallo v. Prudential Residential Servs.,

24

Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)).

Evidence of pretext may take a number of forms. It may be circumstantial and may include that which was proffered to establish plaintiff's prima facie case. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (discussing the McDonnell Douglas burden-shifting framework); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 81 (2d Cir. 2001) (citing cases). Moreover, if plaintiff's prima facie case is strong, that evidence may be sufficient to raise a question of fact about the true motivation for the complained-of employment action, in which case plaintiff would not be required to proffer further proof to survive summary judgment. See Reeves, 530 U.S. at 143; Holtz, 258 F.3d at 81 (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)).

"[A]n extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination case, intent is at issue." Wali, 678 F. Supp.2d at 180 (citing Gallo, 22 F.3d at 1224). Since "[a]n employer's records will rarely document the state of mind or motives of its decision-makers," the plaintiff's proffered evidence "'must be carefully scrutinized' for circumstantial evidence about the employer's state of mind and

25

those factors that motivated the challenged action." Id. (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996)). Nevertheless, it is clear that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact." McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997).


III. Plaintiff Established a Prima Facie Case
     of Gender Discrimination


Bearing in mind that plaintiff's burden of proof on his prima facie case is "minimal," St. Mary's Honor Ctr., 509 U.S. at 506, we conclude that Oliveras makes such a showing.


A. Plaintiff is a Member of a Protected Class


As a male, plaintiff is a member of a class protected under Title VII. 42 U.S.C. § 2000e-2(a)(1); see also Ames v. Cartier, Inc., 193 F. Supp.2d 762, 770 (S.D.N.Y. 2002).


B. Plaintiff was Qualified for the Position in Question


Defendant does not dispute plaintiff's qualifications or

26

fitness as a TSA employee, and we therefore assume for the sake of the present motion that plaintiff was qualified for the position in question.[14]

## C. Plaintiff Suffered an Adverse Employment Action

Plaintiff suffered an adverse employment action when he was terminated from TSA employment on August 17, 2004. (E.g., Cargo Decl. Ex. B, at US 0063); see also Leibowitz, 584 F.3d at 499 (termination can comprise an adverse employment action under Title VII).

## D. Inference of Discrimination

Plaintiff argues that he makes a prima facie showing of gender discrimination. (Pl.'s Aff. 7-9). He states that he "was discharged and Ms. Travis left on the workforce for the same exact incident," and that his "discharge occurred in circumstances giving rise to an

---

[14] "[P]laintiff need not demonstrate 'satisfactory performance of job duties' in order to make out a prima facie case. The prima facie showing requires only a showing that [he] was 'qualified for the position [he] held.'" Herbert v. City of N.Y., 748 F. Supp.2d 225, 237 (S.D.N.Y. 2010) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)). To satisfy this prong, plaintiff need only show that he has the basic skills necessary to perform the job. Id. (quoting, inter alia, Holcomb).

inference of discrimination on the basis of membership in that class." (Id. at 12, 18-19).[15] Defendant asserts that plaintiff and Ms. Travis are improper comparators because the TSA treated them differently only after it determined that plaintiff was the initial aggressor in the June 17 incident, "destroy[ing]" any possible inference of discrimination. (Def.'s Mem. 17-18).

A male plaintiff may raise an inference of discrimination by showing that he was treated less favorably than "similarly-situated" female employees. See Abdu-Brisson, 239 F.3d at 466-68; Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997). "An employee is similarly situated to a co-employee if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010) (quoting Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)). The complaining employee must demonstrate that the individual(s) with whom he seeks comparison were similarly situated in "all material respects." Shumway, 118 F.3d at 64. What constitutes "all material respects" varies by case, but "the standard for comparing conduct requires a

---

[15] He states that defendant is not entitled to summary judgment "for several reasons," but then alleges only "that TSA decided to terminate [him] and not Ms. Travis for the same exact incident is a clear violation of 'Title VII.'" (Pl.'s Aff. 7-8).

reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham, 230 F.3d at 40. "If there are so many distinguishing factors between the plaintiff and the comparators, the Court may conclude they are not similarly situated." Finn v. N.Y. State Office of Mental Health, 2011 WL 4639827, at *15 (S.D.N.Y. Oct. 6, 2011) (citing McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001); Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). "In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." Conway v. Microsoft Corp., 414 F. Supp.2d 450, 464, 466 (S.D.N.Y. 2006) (gathering examples).

Generally, whether employees are similarly situated is a factual issue that should be submitted to a jury. Harlen Assocs., 273 F.3d at 499 n.2 (quoting Graham, 230 F.3d at 39). However, this rule is not absolute; "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly-situated prong met." Id. (citing Cruz v. Coach Stores, 202 F.3d 560, 568 (2d Cir. 2000)). For example, if "a plaintiff's misconduct is objectively more serious than that of a proposed comparator,

29

differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment." Akinyemi v. Chertoff, 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008) (quoting Conway, 414 F. Supp.2d at 464, 466).

In the present case, plaintiff has demonstrated that he was treated differently from a female co-worker -- he was fired while Ms. Travis was retained. In addition, if we look solely to his evidentiary proffer, the record reflects that a reasonable jury could find that he and Ms. Travis were similarly situated in all material respects. They held the same position at the TSA (see Wilkins Decl. Exs. 1-2), had the same supervisors (see Cargo Decl. Ex. C (TSS supervisors were Stephen Hannon, Robert Creager, and "Ed" Demetrious) & Ex. D, at US 0016-0017), and were subject to the same disciplinary standards and post-incident procedures. See Doe v. City of N.Y., 2009 WL 7295358, at *1, *8 (E.D.N.Y. Nov. 10, 2009) (finding that female plaintiff had demonstrated a prima facie case of gender discrimination where her application for preferred disability retirement pension benefits was denied but her male comparator's was granted; she and male co-worker were similarly situated because they worked in the same division, applied for the same benefits at the same time and based on the same disability, were subject to the same physical examination, and had their

30

applications reviewed by the same administrative board).

Plaintiff and Ms. Travis were both required to comply with the TSA's Interim Policy on Employee Responsibilities and Conduct, HRM Letter No. 735-1 ("IPERC"), which was issued on January 9, 2003. (See Wilkins Decl. Ex. 5). IPERC applied to all TSA employees, and established employee-conduct standards to promote efficiency, proper behavior, and ethical conduct. (Id. ¶ 1). All employees were on notice that failure to comply with IPERC could result in "disciplinary or other corrective action." (Id.). In particular, paragraph thirteen of IPERC states that "violent, threatening, harassing and/or confrontational behavior is unacceptable and will not be tolerated." (Id. ¶ 13). Such inappropriate behavior includes: raising one's voice in anger, obscene language or gestures, name calling, remarks or gestures that "communicate a direct or indirect threat of physical harm or otherwise frighten or cause an individual concern for his or her personal safety," pushing, and any other act that "creates a fearful environment or the apprehension of harm." (Id.). The record reflects that both plaintiff and Ms. Travis violated IPERC paragraph thirteen during the June 17 incident. (E.g., id. Ex. C, at US 0116 (Ms. Travis admits to calling plaintiff a thief and "sw[inging] back" at him) & Ex. D, at US 0016 (plaintiff admitted to EEO counselor that he

31

said "fuck you" to Ms. Travis during their altercation)).[16]

Following the June 17 incident, the TSA treated plaintiff and Ms. Travis equally by placing them both on two months of administrative leave pending the investigation and any appeals, and then recommending that they both be terminated based on "Improper Conduct." (Wilkins Decl. Exs. 1-2).[17] Plaintiff and Ms. Travis were both allowed to, and did, appeal that recommendation.[18] Following an investigation and review of their appeals, the TSA determined that plaintiff should be terminated and that Ms. Travis should be retained.

Plaintiff asserts that Ms. Travis was the aggressor, that he did not put his hands on her, and that this incident was witnessed

---

[16] Both Ms. Travis and plaintiff were also subject to the TSA's Management Directive No. 1100.75-1, which "set forth the [TSA's] policies and procedures on the use of disciplinary and adverse actions to address employee performance and conduct problems." (Wilkins Decl. Ex. 3, ¶¶ 1, 6(A)(1)). That directive specifies that a TSS can be terminated for first offense; an attached non-exhaustive list enumerates those first offences for which firing is mandatory. (Id. ¶ 6(C)(2-3) & Attachment (a non-criminal assault does not warrant per se termination)).

[17] Mr. Lauro's notices of proposed termination stated that plaintiff was "injured" during the June 17 incident, and that Ms. Travis had "inflicted injury to the other screener" during that incident. (Wilkins Decl. Exs. 1-2).

[18] The TSA's identical treatment of plaintiff and Ms. Travis further suggests that they were similarly situated.

by one or more TSA employees. This proffer would permit an inference that the TSA's decision to retain Ms. Travis but not plaintiff was influenced by gender bias. Therefore, plaintiff has met his "minimal" burden of establishing a prima facie case of gender discrimination based upon his alleged disparate disciplinary treatment following the June 17 incident.[19] See Temple v. City of N.Y., 2010 WL 3824116, at *8 (E.D.N.Y. Sept. 23, 2010) (citing Graham, 230 F.3d at 42–43) (finding that African-American plaintiff had established prima facie claim of race discrimination where employer disciplined her more harshly than her Caucasian co-workers with whom she was involved in verbal and physical confrontations, even though her supervisor had concluded after each incident that she had engaged in conduct that was more serious than that of her comparators); see also Sicular v. N.Y.C. Dep't of Homeless Servs.,

---

[19] Defendant disputes this conclusion. She argues that Ms. Travis is an improper comparator because the TSA determined that she and plaintiff did not "engage in the same conduct." (Def.'s Mem. 17-18). However, plaintiff and Ms. Travis were involved in the same incident that led to their unequal discipline, the underlying facts of which plaintiff disputes. Cf., e.g., Cruz, 202 F.3d at 568 (Hispanic plaintiff who was terminated for failing to comply with "no-assault" rule failed to establish that she was similarly situated to non-Hispanic employees because she had engaged in a physical fight, while it was undisputed that proffered non-Hispanic comparator employees had engaged in only verbal assaults). Because plaintiff and Ms. Travis may have been similarly situated, his proffer, without regard to defendant's neutral explanation for the deferential results, could permit a finding that gender, as opposed to plaintiff's assertedly disproportionate misconduct, motivated his termination.

33

2010 WL 423013, at *19 & nn.25-26 (S.D.N.Y. Feb. 4, 2010); but see
Maturine v. Am. Int'l Grp., Inc., 2006 WL 3206098, at *4-5
(S.D.N.Y. Nov. 6, 2006) (finding no inference of discrimination
where employer terminated African-American plaintiff but retained
Caucasian co-worker with whom plaintiff was involved in physical
altercation because employer had concluded that plaintiff was the
initial aggressor even though plaintiff disputed that conclusion;
court noted that parties were employed by different subsidiaries of
defendant employer, and that plaintiff was arrested following the
altercation while his co-worker was not).[20]

IV. Pretext Analysis

        Because plaintiff has established a prima facie case, the
burden shifts to defendant to produce evidence that plaintiff was
terminated for a legitimate, nondiscriminatory reason. Ricci v.
DeStefano, 530 F.3d 88, 110 (2d Cir. 2008) (quoting Reeves, 530
U.S. at 142). When a plaintiff has been terminated based on his

---

        [20] We disagree with the analysis in Maturine insofar as the
court relied on the defendant's investigatory findings to reject
that plaintiff's prima facie case. That approach conflates the
plaintiff's initial burden at the prima facie stage of the
analysis with the pretext stage, which requires the court to
assess the defendant's neutral explanation for its adverse
employment action.

misconduct, the question is not whether the employer was correct in attributing fault to him, but whether the employer made a "'good-faith business determination.'" Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp.2d 98, 111 (S.D.N.Y. 2009) (quoting Baur v. Rosenberg, Minc, Falkoff & Wolff, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008)). "It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." Hyek v. Field Support Servs., Inc., 702 F. Supp.2d 84, 93 (E.D.N.Y. 2010).

The TSA asserts that it terminated plaintiff because he had initiated a physical altercation at an airport security checkpoint, which "adversely affected [the TSA's] ability to provide proper security." (Wilkins Decl. Ex. 6, at US 0133). The TSA determined that his conduct was "very serious and constituted a direct violation of [Section 13 of] TSA HRM Letter No. 735-1," which prohibits workplace violence. (See Wilkins Decl. ¶ 4 & Ex. 5, at US 0537 ¶ 13, Ex. 6).[21] Mr. Wilkins stated that he had made his termination decision after "considering both of plaintiff's responses, the incident reports provided by witnesses at the checkpoint, TSA HRM Letter No. 735-1 and [Management Directive]

---

[21] Plaintiff acknowledged that he received and read this letter. (See Cargo Decl. Ex. G, at US 0124).

1100.75-1, and the seriousness of the offense." (Id. ¶ 5). He "did

not consider plaintiff's gender in making [that] decision." (Id.).

Thus, the TSA's asserted reasons for firing plaintiff are, on their

face, both non-discriminatory and responsive to legitimate

workplace concerns. Lessey v. Broadway Elec., 2009 WL 3755471, at

*5 (S.D.N.Y. Nov. 2, 2009) (finding "plaintiff's involvement in an

altercation on a worksite" a "legitimate, nondiscriminatory reason

for terminating plaintiff's employment").


Because the TSA has offered a legitimate, non-discriminatory

reason for plaintiff's termination, "the burden shifts back to the

plaintiff to show that the defendant's legitimate reasons [are] a

mere pretext for discrimination." Davis v. Avaya, Inc., 295 F.

App'x 380, 381 (2d Cir. 2008) (citing Patterson v. Cnty. of Oneida,

375 F.3d 206, 221 (2d Cir. 2004)). If he fails to "'show that there

is evidence that would permit a rational factfinder to infer that

the employer's proffered rationale is pretext, summary judgment

dismissing the claim is appropriate.'" Id. (quoting Patterson).


Plaintiff argues that his "written statements, Ms. Travis'

admitting she striked [sic] [him] and other documentation on file

'suffices'" to prove his case. (Pl.'s Aff. 20 ("Pretty much TSA

says even though I can prove a prima facie case they are the gov't

36

and they can do whatever they want and I have to live and accept such notion. That is not happening!!!" (emphasis in original))). He further asserts that upon his "establishing a prima facie case of gender discrimination summary [judgment] should in fact not be granted because TSA has not articulated a legitimate case." (Id. at 19 (emphasis in original)). He also asserts that the decision to terminate him was not a "business decision" (Pl.'s Mot. Decl. 6), and that both Mr. Wilkins and Mr. DeFrancesco acted in concert to lie about his role in the June 17 incident. (Pl.'s Aff. 8, 12, 16-17 (stating that "Mr. De[F]rancesco then went on an[d] blatantly lied that Ms. Travis was not the aggressor" and that "Mr. Wilkins decided to terminate me also blatantly lying saying I turned the alter[c]ation to a physical one" (emphasis in original))).[22]

---

[22] Plaintiff appears confused about his required showing at this stage of the litigation. He attaches to his opposition pages seven through seventeen of our October 1, 2009 Report and Recommendation, on which he writes notes, inter alia, agreeing with our conclusion that his gender-discrimination claim "passes muster." (Pl.'s Aff. 46). Furthermore, in his April 3, 2011 Letter, he stated that "[t]he same way TSA is using past cases as precedence I am doing the same with the cases you pointed out in your report that 'suffice' in my case. Two employees disciplined in total opposite ways (one fired one not-fired) is a clear violation of the employee fired especially when it was for the same exact incident, whether both employees are of the same sex or not." (Letter 6, Apr. 3, 2011). Although plaintiff's gender-discrimination claim was adequately pled, the evidence that he currently presents is insufficient to survive summary judgment.

While it is clear that plaintiff staunchly believes that the decision to terminate him was not based on what actually happened during the underlying incident, he offers nothing beyond speculation and conclusory allegations in support of that belief and no evidence to demonstrate that impermissible animus motivated the termination. Thus, he provides no evidence based on which a rational jury could determine that the TSA's proffered reason for its decision was a mere pretext for gender discrimination.

Plaintiff focuses on three arguments in opposing the TSA's proffer: (1) that the TSA was either mistaken or misstated the facts in finding that plaintiff was the aggressor in the June 17, 2004 incident; (2) that Mr. Senquiz and Mr. Creager, a TSA supervisor, conspired to forge Mr. Senquiz's incident report, in which he supposedly falsely stated that he did not see who was the initial aggressor in the June 17, 2004 incident; and (3) that Ms. Travis, and her version of the incident, are not credible. (See generally Pl.'s Aff.; Oliveras Dep.). These allegations do not save plaintiff's claim that the TSA engaged in gender discrimination.

A.    The June 17, 2004 Incident

Plaintiff disputes that he was the initial aggressor in the

38

June 17 incident, and maintains that Ms. Travis scratched his face and neck but that he never became physical with her. It is mainly on this basis that he disputes the TSA's non-discriminatory reason for his termination. Although plaintiff denies that he was the aggressor, that assertion without more cannot defeat summary judgment.

In the present context the answer to the question of who actually initiated the fight does not necessarily dictate whether plaintiff's claim can survive. "In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff [that led to the adverse action]. We are interested in what 'motivated the employer' . . . [and] the factual validity of the underlying imputation against the employee is not at issue." McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (emphasis in original) (internal citation omitted) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).

The record reflects that the TSA's decision to fire plaintiff was based on the conclusion of Mr. Wilkins that Oliveras was the aggressor in the June 17 incident. Plaintiff does not dispute that he and Ms. Travis both engaged in some sort of argument or

39

"assault" while performing a very important safety function in an extremely crowded environment. (See Cargo. Decl. Ex. B, at 4 & Ex. C, at US 0119). Based on the TSA's investigation into the June 17 incident, including the review of sworn statements from a number of disinterested third-parties and plaintiff's own appeal, Mr. Wilkins and Mr. DeFrancesco both concluded that plaintiff was the aggressor in the June 17 incident.[23] (See Wilkins Decl. ¶ 5 & Ex. 7). Even if that conclusion was in error, that error in and of itself would not allow one to infer a gender-based discriminatory motive underlying the resulting decision to terminate plaintiff. Cf. Randall v. Potter, 2004 WL 439491, at *5 (S.D.N.Y. Mar. 9, 2004) (citing Holland v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990)) (finding that even if defendant-employer terminated plaintiff based on an incorrect belief that plaintiff had engaged in improper conduct, that belief did not demonstrate a discriminatory motive).

"To prove his [gender] discrimination claim, plaintiff must do

---

[23] Mr. Lauro reached the same conclusion. In plaintiff's deposition of Mr. Lauro, he asked if it would "be safe to say that Travis was the instigating assailant," to which Mr. Lauro responded "[n]o, I don't believe so." (Cargo Decl. Ex. K, Lauro Dep. 20:15-18). Plaintiff then asked how Mr. Lauro came to that conclusion, to which he responded "[i]t has nothing to do with your gender. It's the facts that were stated in the reports." (Id. at 20:19-21:3). Plaintiff inquired as to what those facts were, and Mr. Lauro answered, "[t]hat [plaintiff] put [his] hand in her face first." (Id. at 21:4-6). Plaintiff responded "[t]hat's a total lie but okay." (Id. at 21:7).

more than simply disagree with defendant's business decisions. As a matter of law, an employee's disagreement with an employer's business decision is insufficient to prove discriminatory conduct." Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y. 1995) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)). "[A]lthough [in some cases] facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness," "[t]he distinction lies between a poor business decision and a reason manufactured to avoid liability." Dister, 859 F.2d at 1116-17. All that matters is that the TSA "'honestly believe[d] in the reasons it offers.'" Hargett v. N.Y.C. Transit Auth., 640 F. Supp.2d 450, 476 (S.D.N.Y. 2009) (quoting Bucknell v. Refined Sugars, Inc., 82 F. Supp.2d 151, 157 (S.D.N.Y. 2000) (quoting Fischbach v. Dist. of Columbia Dep't of Corrs., 86 F.3d 1180, 1183 (D.C. Cir. 1996))). While "[i]t is true that in a given case a finding of discriminatory intent may be grounded in disbelief of an employer's proffered reason for discharge, especially if accompanied by a suspicion of mendacity, . . . for a rational jury to find discriminatory intent, there must be evidence which points to discrimination." Payne v. State of N.Y. Power Auth., 997 F. Supp. 492, 498-500 (S.D.N.Y. 1998) (citing Fisher v. Vassar Coll., 114 F.3d 1332, 1338 (2d Cir. 1997); Henry v. Daytop

Vill., Inc., 42 F.3d 89, 96 (2d Cir. 1994)) (granting summary judgment for defendant employer and its managers where plaintiff employee disputed defendant employer's evaluation of her performance and her demotion but failed to offer any evidence that defendant's explanation of its decision was a pretext for race discrimination).

Plaintiff offers no evidence to suggest that the TSA did not really base the termination decision on the conclusion of Mr. Wilkins (seconded by Mr. DeFrancesco) that plaintiff had initiated the brawl with Ms. Travis. Moreover, even assuming that a jury could disbelieve the TSA's proffered reason for terminating plaintiff, he has not presented any evidence that gender motivated his termination. See St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93-94 (2d Cir. 2001). Plaintiff does not allege that Mr. Wilkins has ever made any comments driven by gender animus, or that anyone at the TSA has a history of gender discrimination -- evidence that would tend to suggest that gender bias played a role in his firing. Cf. Campo v. Slater, 128 F. App'x 173, 174-75 (2d Cir. 2005) (affirming district court's grant of summary judgment

42

for employer, citing plaintiff's failure to show evidence that
supervisors made "disparaging comments evincing a gender bias"
directed towards male employees as part of his proffer of
"insufficient evidence from which a reasonable trier of fact could
conclude that gender bias motivated the [employment] setbacks [that
plaintiff had] experienced"); Cifra v. G.E. Co., 252 F.3d 205, 216
(2d Cir. 2001) (stating that at trial, plaintiff had not "cited to
. . . any substantial evidence of gender bias, such as a
decisionmaker's gender-derogatory comments or documents").
Plaintiff's bare allegations that the TSA officials or witnesses to
the incident were lying do not demonstrate falsehood, much less
suggest that gender motivated the firing decision.[24]

### B. Senquiz Incident Report

Plaintiff's theory that Mr. Senquiz's incident report was
forged, either by or in concert with Mr. Creager, appears to
represent two somewhat different arguments. The first is that Mr.
Senquiz actually saw that Ms. Travis was the aggressor and lied
about this in his report, and the second is that the report itself

---

[24] Indeed, to the contrary, plaintiff insists that he could
have been promoted to "Lead Screener" if he were still employed
with the TSA -- a belief that is wholly inconsistent with
allegations of unequal treatment. (Cargo Decl. Ex. B., at US 0064
& Ex. H, Oliveras Dep. 223:10-12).

was "forged." Both assertions by plaintiff are unsupported by any

evidence.   Mr.   Senquiz   reported   that   the   June   17,   2004

"confrontation became physical," that the incident "happened very

rapidly," and that he was "unable to see who attacked first."

(Cargo Decl. Ex. C, at US 0120). Although plaintiff asserts that

Mr. Senquiz saw Ms. Travis attack him first (see Cargo Decl. Ex. H,

Oliveras Dep. 72:21-75:20, 110:14-111:18), he offers no basis for

inferring that he could know what, if anything, Mr. Senquiz saw.[25]


       As for the purported forgery, plaintiff admitted in his

deposition that he had no reason to believe that there was a

conspiracy to terminate him (Cargo Decl. Ex. H, Oliveras Dep.

261:18-262:22), and Mr. Senquiz testified repeatedly that he had

---

[25] Plaintiff stated that he "told Andre to say the truth and
what happened . . . right after it finished. And [Andre] did not
and he lied." (Cargo Decl. Ex. H, Oliveras Dep. 186:11-13). He
also reported that following the incident, Senquiz told him
"[y]eah, I saw. You wasn't . . . at fault," although he quickly
asserted that he did not remember exactly what was said. (Id. at
73:9-19). Similarly, during Senquiz's deposition, plaintiff asked
him if he "remember[ed plaintiff] pulling [him] to the side
[following the incident] and telling [him that] . . . [plaintiff]
didn't do anything, [plaintiff] didn't hit her." (Cargo Decl. Ex.
J, Senquiz Dep. 7:17-19; repeated at 14:5-8). He did not. (Id. at
14:12-13). Plaintiff's alleged recounting of the incident to
Senquiz does not support his assertion that Senquiz saw who
started the fight. Plaintiff also suggested that Senquiz must
have seen the altercation based on his proximity to the parties
involved. (E.g., id. at 20). However, Senquiz repeatedly denied
having seen who initiated the fight. (E.g., id. at 3:22-23,
20:19-21).

44

drafted his own incident report. (See Cargo Decl. Ex. J, Senquiz Dep. 6-8, 10:9-18). Furthermore, plaintiff does not provide a factual basis on which one can conclude that such forgery or falsification actually occurred. (E.g., Cargo Decl. Ex. H, Oliveras Dep. 109:19-24 (plaintiff was never told that Mr. Senquiz was coached in writing his incident report), 113-114:25, 214:2-6, 270:7-271:18 (plaintiff refused to answer when asked what motive Mr. Senquiz would have to lie in his incident report other than not wanting to lose his job)). Plaintiff instead relies on his own lay analysis of the handwriting in the incident report, which he supposedly first "noticed" was forged at his deposition. (E.g., Cargo Decl. Ex. H, Oliveras Dep. 126:11-21 (plaintiff admits that he does not have any basis for concluding that the Mr. Creager forged Mr. Senquiz's incident report "other than [he] think[s] [that] it [was forged]"), 271:14-272:25 (plaintiff admits that the first time he realized that Mr. Senquiz forged his incident report was at his first deposition, taken on November 4, 2010)).

Plaintiff offers no evidence beyond speculation that the incident report was forged, and fails to explain how such a fact, even if true, would demonstrate that his termination was attributable to gender animus. There is no evidence that Wilkins, who made the termination decision, had any knowledge of the alleged

45

falsehoods in Senquiz's incident report, and, in any event, plaintiff offers no evidence that Senquiz was influenced by any such animus in provided his version of the facts. We reiterate that it does not matter if the TSA was mistaken in its understanding of the specifics of the June 17, 2004 incident. As long as the termination decision was not gender-motivated, it is irrelevant whether it was based on a belief that was mistaken. McPherson, 457 F.3d at 216.

### C. Plaintiff's Attack on Ms. Travis' Credibility

Plaintiff also attacks Ms. Travis's character in an apparent attempt to undermine her credibility. (E.g., Pl.'s Aff. 16-18; Pl.'s Supplement 3-4). This set of arguments is also beside the point.

Plaintiff accused Ms. Travis of having inappropriate intimate relationships with her superiors, which, he insinuates, may have improperly influenced their decisionmaking. (E.g., Cargo Decl. Ex. H, Oliveras Dep. 265:7-17; Cargo Decl. Ex. I, Travis Dep. 23:19-24:14, 27:2-5, 33:2-4, 33:19-20, 34:1). Plaintiff also asked Ms. Travis if she had "mental problems," which she denied. (Cargo Decl.

46

Ex. I, Travis Dep. 21:23-25).[26] He also accused Ms. Travis of lying

in her incident statements (id. at 16:4-6, 17:19-21, 32:10-24)[27] and

violating TSA employee performance standards. (E.g., id. at 25:13-

19; Pl.'s Supplement 4-5). In addition, plaintiff attempted to

establish that Ms. Travis had a history of lateness and other minor

employment infractions. (E.g., Cargo Decl. Ex I, Travis Dep. 28:18-

20, 29:1-3, 29:20-30:20). He repeatedly accused Ms. Travis of lying

about her tardiness, and then insinuated that if she were lying

about that, she was also lying about her version of the June 17,

2004 incident.[28] (E.g., id. at 29:9-12).


    Putting to one side plaintiff's incompetence to testify about

any of his accusations directed at Ms. Travis, we are not to engage

in a comparative credibility analysis between the two combatants;

---

[26] Plaintiff admitted that he had no basis outside of "rumor"
and his own observations of Ms. Travis's conduct to believe that
she had mental problems. (Cargo Decl. Ex. H, Oliveras Dep.
242:14-255:25, 262:23-264:7).

[27] Plaintiff submits Ms. Travis's original incident report
completed on June 17, 2004, and her second statement, submitted
in connection with her appeal on July 26, 2004. (Pl.'s Aff. 16-
17, 61-64). He alleges that they are inconsistent (id. at 16),
and comments multiple times on the alleged "11 lies" in her
retelling of the incident in the second statement, numbering each
and elaborating in handwritten notes on why each is supposedly a
lie. (Id. at 16, 61-64; see also Pl.'s Supplement 3).

[28] He stated that "I just want to say how much of a liar you
are. That's just gonna lead to everything else if that's how much
of a liar you are." (Cargo Decl. Ex I, Travis Dep. 31:9-12).

we are only concerned with what motivated TSA's decision to terminate plaintiff. The TSA was free to find Ms. Travis more credible than plaintiff, as long as it based its termination decision on its good-faith belief and not on plaintiff's gender. See, e.g., Kolesnikow, 622 F. Supp.2d at 111-12.


D. Deposition Evidence


In connection with this action, plaintiff deposed four current and former TSA employees -- Mr. Lauro, Mr. Wilkins, Ms. Travis, and Mr. Senquiz. None of the deponents provided any testimony that creates a material fact issue in the present case.[29]

---

[29] Although plaintiff did not depose Mr. DeFrancesco -- because he failed to subpoena him despite being given adequate opportunity to do so -- the record reflects that such a deposition would have been immaterial. DeFrancesco completed a signed Witness' Affidavit on May 24, 2005 in connection with plaintiff's EEO complaint. (See Cargo Decl. Ex. E). In an email attached to that affidavit, dated June 6, 2005, he explained to Ms. Gibson, plaintiff's EEO Counselor, that he had determined "that [Ms. Travis] was provoked and acted in self-defense" based on her written and oral appeals of the notice of proposed removal. (Id. at 0087). He therefore determined that her proposed termination should be rescinded and that she should be reinstated to her position as a TSA screener. (Id.). In addition, he did not participate in the decision to terminate plaintiff. We therefore fail to see what light DeFrancesco could have possibly shed on Mr. Wilkins's decision to terminate plaintiff, when it is undisputed that Mr. Wilkins made that decision.

48

1. Lauro Deposition

Neal Lauro is the TSA supervisor who recommended the termination of both plaintiff and Ms. Travis following the June 17 incident. At multiple points in the deposition, plaintiff aggressively insisted to Mr. Lauro that gender bias caused the TSA to fire him and not Ms. Travis. (E.g., Cargo Decl. Ex. K, Lauro Dep. 12:18-14:12). However, when asked how he had reached his recommendation, Mr. Lauro explained that it was based on the TSA investigation, incident statements from Travis, plaintiff, eye-witnesses, and supervisors, and the operative code of conduct. (Id. at 7:1-8, 22:10-17). Lauro also explained that Mr. DeFrancesco could have decided to retain Ms. Travis despite his recommendation because, as his supervisor, Mr. DeFrancesco was privy to information of which he was not aware. (Id. at 11:9-19, 18:4-11). Mr. Lauro also testified that he knew of "many times" -- and then "some" cases -- when a deciding official did not follow a subordinate's disciplinary proposal. (Id. at 11:20-22, 12:1-11).

Plaintiff repeatedly asked Mr. Lauro if he believed that the decision to terminate him but not Ms. Travis was "biased or gender discrimination," while insisting that it was. (E.g., id. at 13:5-13, 14:3-12, 27:5-22). Mr. Lauro refused to agree that Mr.

49

DeFrancesco's decision to retain Ms. Travis was "biased or gender discrimination," saying that he did not "think it would be" or "believe it was" because he did not "believe Mr. DeFrancesco would discriminate against someone." (Id. at 13:8-13, 27:12-22, 28:6-10). Mr. Lauro also emphasized multiple times that Mr. DeFrancesco "bas[ed] his decision on information that he [had] and that he was "someone [in] a different position, as a deciding official, making a determination based on the information [he] had." (Id. at 13:8-17, 27:12-22, 28:6-10). Finally, when plaintiff asked a somewhat unclear question regarding the TSA's investigation into, and determination of, who was the aggressor in this case, the following dialogue ensued:

> A: It has nothing to do with your gender. It's the facts that were stated in the reports.
>
> Q: And what were they?
>
> A: That you put your hand in her face first.
>
> Q: That's a total lie but okay.

(Id. at 21:1-7).


### 2. Wilkins Deposition

Oliveras deposed Wilkins, the TSA official who decided to

terminate him, on April 30, 2012. (See Decl. of Shane Cargo Ex. B (deposition transcript), June 1, 2012). Plaintiff spent the majority of his time asking Wilkins about the TSA's investigation into the June 17 incident (e.g., id. at 5-12, 14:22-18:3, 18:10-23), about Wilkins' knowledge of Title VII (e.g., id. at 47:5-48:4), and about whether his termination had violated Title VII. (E.g., id. at 14:3-9, 32:3-14). He also repeatedly attempted to contradict the TSA's finding that he was the aggressor in the June 17 incident. (E.g., id. at 26:8-32:14). When Wilkins stated that his "determination was not based on gender" (id. at 57:5-6), Oliveras answered that "whether or not it was, the law says you cannot do what you did . . . ." (Id. at 57:7-8). Although plaintiff stated that the parties were "supposedly equally responsible for the altercation" (id. at 60:2-21), the TSA found otherwise prior to terminating him. (E.g., Cargo Decl. Ex. K, at 21:1-7). As previously discussed, plaintiff's disagreement with the TSA's decision and conclusory accusations that gender discrimination occurred are insufficient to defeat summary judgment.

### 3. Travis Deposition

Plaintiff asked Travis to recount her version of the June 17 incident and repeatedly accused her of being untruthful,

interjecting multiple times with comments such as "[t]hat's a total lie." (E.g., Travis Dep. 3:21-5:2, 7:13-8:25). He also asked her about her two allegedly conflicting incident statements. (Id. at 12:12-13:10, 14:6-12).[30] As discussed earlier, he also repeatedly attacked her credibility (e.g., id. at 14:25-16:20, 17:19-21, 31:9-22), and accused her of having relationships with her supervisors. (E.g., id. at 23:19-24:19, 27:2-5, 33:2-4). Ms. Travis denied that she had "violat[ed] the civil rights of other co-workers by scratching them and then assaulting them in the face" (id. at 26:12-18), and in any event there is no indication she had any power to -- or actually did -- participate in the TSA's decision to terminate plaintiff.

### 4. Senquiz Deposition

Plaintiff asked Senquiz to recount his recollection of the June 17 incident (e.g., Cargo Decl. Ex. J, Senquiz Dep. 3:3-6:2, 14:14-27) -- often encouraging Senquiz to adopt his version of events -- and asked whether Senquiz had seen the injuries that Ms. Travis had allegedly inflicted on Oliveras's face and neck. (E.g.,

---

[30] Plaintiff claims that in Ms. Travis's first statement she admitted only that she had "swung" at him, which is contrary to reports of plaintiff having scratches on his face and neck. (Pl.'s Supplement 3).

id. at 10:24-11:20, 14:4-42:21). Senquiz explicitly stated that he did not remember who had initiated the fight. (Id. at 20:19-20). Plaintiff then spent the remainder of the deposition attempting to elicit testimony in support of his theory that Senquiz had forged his incident report. (Id. at 6:3-10:18, 42:22-44:8).

### 5. Plaintiff's Deposition

Plaintiff was uncooperative during his deposition. While he admitted that he remembered being "assaulted by somebody in the lane," he largely refused to answer any questions related to the June 17 incident, instead referring opposing counsel to his contemporaneous incident report for answers. (Def.'s R. 56.1 ¶ 53; e.g., Cargo Decl Ex. H, Oliveras Dep. 84:21-91:23).[31] The only answer that plaintiff provided that even arguably addressed the alleged gender discrimination is the following:

> Hey, if she assaulted me and they -- they terminate me and they keep her, something's wrong with this picture, especially I'm -- I'm not the one who started or I'm not the aggressor. So something's wrong with this

---

[31] He stated that he had not omitted anything from his incident report, and that he did not wish that he had included any additional information in it. (Def.'s R. 56.1 ¶ 54; e.g., Cargo Decl Ex. H, Oliveras Dep. 84:23, 99:10-18).

> picture . . . [i]f anything, maybe they should
> have fired both of us, but not keep her and
> ger rid of me, especially if I'm not the one
> who assaulted. So there's a problem there.

(Cargo Decl. Ex. H, Oliveras Dep. 262:7-18). This statement reflects plaintiff's belief that he should not have been fired while his female coworker, Ms. Travis, was retained. However, such a vague and conclusory statement is insufficient to demonstrate that the TSA's asserted neutral reason for firing plaintiff is mere pretext and a mask for gender discrimination.

### E. Conclusion

Because plaintiff presents no evidence that could reasonably support an inference that the TSA's non-discriminatory reasons for his termination were a pretext for sex discrimination, his Title VII claim must fail at the third step of the McDonnell Douglas framework. Cf. Jeunes v. Potter, 382 F. App'x 2, 3-4 (2d Cir. 2010) (affirming summary judgment for employer because African-American plaintiff could not establish pretext for discrimination where employer asserted that plaintiff was fired for violating its zero-tolerance policy based on his participation in an altercation with his white coworker, even though the white coworker was retained;

plaintiff had used profanity in the argument while the other employee had not, and plaintiff had submitted no evidence that his co-workers' disciplinary history was comparable to his, which was extensive and included multiple multi-day suspensions); Gilmore v. Lancer Ins. Co., 2010 WL 87587, at *8-9 (E.D.N.Y. Jan. 7, 2010) (discussing Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 189-91 (1st Cir. 1990), which affirmed summary judgment in favor of defendant hospital because plaintiff offered no evidence demonstrating that his discharge was based on racially discriminatory reasons rather than on his role as an instigator in an altercation with his co-worker; evidence that the co-worker was not discharged was insufficient to sustain appellant's burden with regard to pretext, as was evidence suggesting that the employer had wrongly concluded that appellant was the agressor); Maturine, 2006 WL 3206098, at *7 (finding that defendant's proffered non-discriminatory reason for terminating African-American plaintiff following an altercation with a Caucasian coworker -- that the other employee's version of the events was more credible and that plaintiff was the aggressor in an unprovoked assault -- was not a pretext for Title VII race discrimination because plaintiff was given the opportunity to explain his version of what transpired and the evidence demonstrated that defendants had a good-faith belief that plaintiff had initiated the assault that led to his termination; court found

55

it irrelevant that plaintiff disputed defendants' conclusion that

he was the aggressor).[32]

---

[32] Plaintiff cites extensive caselaw and other legal
materials in opposing this conclusion. (See Pl.'s Aff.,
attachments; Pl.'s Supplement 6; Resp. to Shane Cargo's Decl. 4).
However, none of the cases that plaintiff cites are relevant to
the current motion. See Jones v. Bock, 549 U.S. 199 (2007)
(finding that inmates were not required to plead or demonstrate
exhaustion in their complaints because the failure to exhaust
claims under the Prison Litigation Reform Act ("PLRA") was an
affirmative defense, that inmates' § 1983 actions did not
necessarily fail to meet the PLRA exhaustion requirement just
because not all named defendants had been named in prior
administrative grievances, and that an inmate's compliance with
PLRA exhaustion requirement as to only some claims does not
warrant dismissal of the entire complaint); Swierkiewicz v.
Sorema N.A., 534 U.S. 506 (2002) (holding that an employment-
discrimination complaint must contain only "a short and plain
statement of the claim showing that the pleader is entitled to
relief" under Rule 8 and finding that "this simplified notice
pleading standard relies on liberal discovery rules and summary
judgment motions to define disputed facts and issues and to
dispose of unmeritorious claims" (emphasis added)); Harlow v.
Fitzgerald, 457 U.S. 800 (1982) (defining the limits of qualified
immunity for government officials, and vacating and remanding
case to reconsider summary-judgment motion in light of that
opinion); Scheuer v. Rhodes, 416 U.S. 232 (1974), abrogated by
Harlow v. Fitzgerald, 457 U.S. 800 (1982), as recognized by Davis
v. Scherer, 468 U.S. 183, 191 (1984) (holding that (1) the
Eleventh Amendment does not always bar an action for damages
against a state official charged with depriving a person of a
federal right under color of state law, and the district court
erroneously dismissed complaints without affording petitioners
the opportunity to establish their claims and that (2) state
executive officers enjoy qualified immunity, the scope of which
depends upon the discretion and responsibilities of the
particular office and the circumstances existing at the time of
the challenged action); Conn. v. Duncan, 612 F.3d 107 (2d Cir.
2010) (reviewing district court's partial grant of motion to
dismiss plaintiff's request for declaratory judgment regarding
the Secretary of Education's interpretation of the No Child Left
Behind Act and granting Secretary's motion for judgment on the

Administrative record, and affirming dismissal of the state's
request for a hearing); Roth v. Jennings, 489 F.3d 499 (2d Cir.
2007) (affirming in part and vacating and remanding in part
district court's dismissal of complaint for failure to state of a
claim of disgorgement of "short-swing profits" under § 16(b) of
the Securities Exchange Act of 1934); Triestman v. Fed. Bureau of
Prisons, 470 F.3d 471 (2d Cir. 2006) (vacating district court's
dismissal of two pro se plaintiffs' claims under Rule 12(b)(1)
because a liberal reading of their pleading stated claims under
the Federal Tort Claims Act, specifically the "negligent guard
theory," and remanding for further proceedings); Achtman v.
Kirby, McInerney & Squire, LLP, 464 F.3d 328 (2d Cir. 2006)
(affirming district court's finding of supplemental jurisdiction
over legal malpractice claims in securities class action against
co-lead class counsel for their failure to name an independent
auditor as a defendant in a securities action, and affirming
district court's dismissal of the complaint because plaintiff
failed to state a claim for malpractice by failing to allege
negligence); Wynder v. Mcmahon, 360 F.3d 73 (2d Cir. 2004)
(vacating and remanding to district court; the district court had
dismissed plaintiff's complaint alleging discrimination under,
inter alia, Title VII, because the core of plaintiff's complaint
was sufficient for Rule 8 pleading purposes); S. Rd. Assocs. v.
Int'l Bus. Machs. Corp., 216 F.3d 251 (2d Cir. 2000) (affirming
district court's grant of defendant's Rule 12(b)(6) motion to
dismiss where plaintiff failed to sufficiently allege that
defendant's storage of chemical waste violated the Resource
Conservation and Restoration Act, 42 U.S.C. § 6901 et seq.);
Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111 (2d Cir. 2000)
(vacating judgment for employer and remanding Title VII race-
retaliation suit primarily based on erroneous jury instructions
regarding plaintiff-employee's burden of proof); Briones v.
Runyon, 101 F.3d 287 (2d Cir. 1996) (finding that genuine issues
of material fact precluded summary judgment on disputed Title VII
and other employment-discrimination claims because the district
court had erroneously concluded that plaintiff's claims were
untimely, and remanding for trial because employer's motion
papers did not address the facts of plaintiff's claims such that
genuine issues of material fact remained); Hernandez v. Coughlin,
18 F.3d 133 (2d Cir. 1994) (affirming district court's finding
that inmate did not have constitutionally protected interest in
conjugal visitation); Butts v. City of N.Y. Dep't of Hous. Pres.
& Dev., 990 F.2d 1397 (2d Cir. 1993), superseded by statute on

57

other grounds, 42 U.S.C. § 1981(b), as recognized in Hawkins v. 1115 Legal Servs. Care, 163 F.3d 684 (2d Cir. 1998) (reversing Rule 12(b)(6) dismissal of two of plaintiff's Title VII race- and sex-discrimination claims as time-barred because they were "reasonably related to allegations in her EEOC charge" because they fell within the "scope of the EEOC investigation which [could] reasonably [have been] expected to grow out of the charge of discrimination"); Castro v. City of N.Y., 2009 WL 2223037, at *11 (S.D.N.Y. July 22, 2009) (finding that a rational jury could find that defendant's neutral explanation for not hiring plaintiff -- poor attendance and disciplinary history -- was a "pretextual mask for retaliatory animus"); Latino Officers Ass'n City of N.Y. v. City of N.Y., 209 F.R.D. 79, 83-86 (S.D.N.Y. 2002) (certifying class based in part on statistical data reflecting racially discriminatory sanctions).

Plaintiff also submits a variety of other legal materials that have no bearing on this case. First, he provides the Second Circuit appellate brief of defendant-appellee Ernst & Young LLP in Fait v. Regions Fin. Corp., 655 F.3d 105 (2d Cir. 2011) (Brief for Defendant-Appellee Ernst & Young, Fait, 655 F.3d 105 (10-2311-cv), 2011 WL 379431), arguing that the district court had correctly determined that plaintiffs failed to state a claim under the Securities Exchange Act of 1934 against Ernst & Young LLP for its role in auditing allegedly fraudulent financial statements for a subsidiary of defendant corporation from which plaintiff-appellant had purchased securities. Second, plaintiff submits an internet post titled, "Ashcroft v. Iqbal: Not Nearly As Important As You Think," which discusses different opinions of pleading requirements in the wake of that decision. Max Kennerly, Ashcroft v. Iqbal: Not Nearly As Important As You Think, Litigation & Trial (June 29, 2009), http://www.litigationandtrial.com/2009/06/articles/trial/ideas/ashcroft-v-iqbal-not-nearly-as-important-as-you-think. Third, plaintiff attaches an article by law professor Benjamin Spencer titled "Understanding Pleading Doctrine," which analyzes exactly what plaintiffs should, and need to, plead to survive a Rule 12(b)(6) motion to dismiss in light of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). A. Benjamin Spencer, Understanding Pleading Doctrine, 108 Mich. L. Rev. 1 (2009). Finally, he includes an excerpt of 42 U.S.C. § 2000e-3, which is not presently at issue. We have reviewed these documents, and none are relevant to this case at its present stage.

58

V. Plaintiff Cannot Assert a Class-of-One Equal Protection Claim

   We also construe plaintiff's pro se opposition papers as attempting to assert a "class-of-one" Fifth Amendment equal-protection claim. (E.g., Cargo Decl. Ex. H, Oliveras Dep. 268:11-18). Such a claim is recognized "'where the plaintiff alleges that [he] has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment.'" Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135, 140 (2d Cir. 2010) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

   This claim must fail in the first instance because section 2000e-16 of Title VII "'provides the exclusive judicial remedy for claims of [gender] discrimination in federal employment.'" Xu v. City of N.Y., 2010 WL 3060815, at *2 (S.D.N.Y. Aug. 3, 2010) (quoting Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976)); accord DiPetto v. U.S. Postal Serv., 383 F. App'x 102, 103-04 (2d Cir. 2010) (stating that "federal employees are restricted to challenges under Title VII when complaining about employment discrimination"); Annis v. Cnty. of Westchester, N.Y., 36 F.3d 251, 255 n.4 (2d Cir. 1994) ("It is . . . clear that federal employees are restricted to Title VII when complaining of employment

59

discrimination."); <u>Ercole v. LaHood</u>, 2011 WL 1205137, at *14

(E.D.N.Y. Mar. 29, 2011) (citing cases) (dismissing plaintiff's

Fifth Amendment employment-discrimination claims as "subsumed

within the claims under Title VII and the ADEA"). Therefore,

plaintiff can only state a gender-discrimination claim under Title

VII.

CONCLUSION

Based on the foregoing, we recommend that defendant's motion

for summary judgment be GRANTED in its entirety.


Pursuant to Rule 72 of the Federal Rules of Civil Procedure,

the parties shall have fourteen (14) days from this date to file

written objections to this Report and Recommendation. Such

objections shall be filed with the Clerk of the Court and served on

all adversaries, with extra copies to be delivered to the chambers

of the Honorable Deborah A. Batts, Room 2510, 500 Pearl Street, New

York, New York 10007-1312 and to the chambers of the undersigned,

Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure

to file timely objections may constitute a waiver of those

objections both in the District Court and on later appeal to the

United States Court of Appeals. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140,

60

150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of

Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: New York, New York
       June 26, 2012

                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE


Copies of this Report & Recommendation have been sent today to:

Mr. Luis Oliveras
104 Eighth Avenue, Apt. 2R
New York, NY 10011

Matthew Lane Schwartz, Esq.
Shane Patrick Cargo, Esq.
Assistant United States Attorney
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street
New York, NY 10007